## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**CHRISTOPHER HICKS,**

        **Plaintiff,**     :

      **v.**                     **Case No. 2:22-cv-2204**
                                 **Judge Sarah D. Morrison**
                                 **Magistrate Judge Chelsey M. Vascura**

**KATHLEEN CROWLEY, *et al.*,**     :

        **Defendants.**

## OPINION AND ORDER

Christopher Hicks is a "government transparency advocate" who brought this suit after the Ohio Board of Tax Appeals (the "BTA") refused to let him record certain public hearings and then banned him from hearings unless he was a party to a proceeding. Naming the BTA, its Executive Director, and its three Board members as defendants, Mr. Hicks alleges that they violated his First Amendment rights of access and of expression (Claims 1, 3), denied him procedural due process under the Fourteenth Amendment (Claim 2), retaliated against him in violation of the First Amendment (Claim 4), and violated the Ohio Open Meetings Act (Claim 5). His federal claims are brought under 42 U.S.C. § 1983.

The matter is before the Court on two motions. First, Mr. Hicks filed a Motion for Preliminary Injunction. (ECF No. 6.) The Defendants opposed (ECF No. 8), and Mr. Hicks replied (ECF No. 22). Defendants then filed a Motion to Dismiss

the Complaint. (ECF No. 24.) Mr. Hicks opposed[1] (ECF No. 28), and Defendants replied. (ECF No. 29). Both motions are ripe for decision.

The Court will address the Motion to Dismiss before turning to the Motion for Preliminary Injunction.

## I.    BACKGROUND

On a Motion to Dismiss, all factual allegations are taken as true. The following summary is drawn from the factual allegations in the Complaint.[2]

BTA is Ohio's administrative tax court, resolving justiciable disputes between parties in appeals from decisions, orders, determinations, and actions of the tax commissioner, tax administrative agencies, county budget commissions, and county boards of revision. Ohio Rev. Code § 5703.02. It hears appeals from decisions of county boards of revision concerning the valuation of real property for tax purposes. *Id.* It is created by statute. *Id.* Kathleen Crowley is the Executive Director of the BTA, David Harberger is its Chair, Jasmine Clements is its Vice Chair, and Jeffrey Caswell is a board member. (Compl. ¶¶ 7–11.) Mr. Hicks has named these individuals as defendants in both their individual and official capacities. (*Id.*)

The BTA conducts two kinds of meetings: nonadjudicatory meetings (when

---

[1]Mr. Hicks did not substantively oppose the Motion to Dismiss with regard to his Ohio Open Meetings Act claim, instead he indicated that he is "willing to dismiss Claim Five." (ECF No. 28, PageID 220.) Accordingly, Claim 5 is **DISMISSED**.

[2]The Court does not construe the Complaint's factual allegations in the light most favorable to the Plaintiff for purposes of a Motion for Preliminary Injunction. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (movant carries burden on preliminary injunction motion of proving circumstances clearly demand it).

the BTA conducts its business not involving tax disputes between parties) and adjudicatory hearings (administrative hearings at which the parties to a tax appeal may present new evidence regarding a specific tax dispute). *See* Ohio Admin. Code §§ 5717-1-16, 5717-1-22. Both types of meeting are open to the public, but the BTA has separate rules for each. *Id.*

Nonadjudicatory meetings are governed by § 5717-1-22 of the Ohio Administrative Code. These meetings are open to the public unless a subject to be discussed at the meeting is specifically excepted from public disclosure by law. *Id.* § 5717-1-22(A). The BTA must give notice of each of these meetings to the public and must maintain minutes of the meetings that notify the public what was discussed. *Id.* §§ 5717-1-22(A), (C), (E), (H). If someone wants to record nonadjudicatory meetings, the BTA rules provide:

> Consent to film, photograph, or record meetings of the board shall be obtained from the chairperson of the board, or with written consent of two members of the board, prior to the start of the meeting. The board may terminate such consent upon its determination that such filming, photographing, or recording is distracting or otherwise disruptive to the meeting process.

*Id.* § 5717-1-22(I).

BTA adjudicatory hearings proceed in a "similar manner to a civil action, with witnesses to be sworn and subject to cross-examination." *Id.* § 5717-1-16(G). If someone wants to record an adjudicatory hearing, the rules provide:

> All hearings before the board shall be open to the public. Hearings may be recorded, and such recordings shall be made available for examination at the board's office.

*Id.* § 5717-1-16(H).

3

In 2021, Mr. Hicks went to several BTA adjudicatory hearings. The first was on October 20, and he was personally a party to the hearing on that day. (Compl. ¶ 22.) Mr. Hicks brought a camera, which he set up to the side of the room. (*Id.* ¶¶ 23, 24.) However, the presiding hearing officer asked Mr. Hicks to stop the recording, telling him that he needed to complete a media request to record the hearing. (*Id.* ¶ 24.) When Mr. Hicks asked the hearing officer for the legal authority that would allow her to stop him from recording the hearing, "she was unable to provide him with support for her decision" and did not provide him a form for a media request. (*Id.*) The October 20 hearing was then canceled and was not rescheduled. (*Id.* ¶ 25.)

Following the October 20 hearing, Mr. Hicks sent a public records request to Defendant Crowley seeking, among other things, any form used to request media access to BTA hearings and copies of any policies that would govern the positioning of cameras in BTA hearing rooms. (*Id.* ¶ 26.) Ms. Crowley responded that the BTA did not have any documents that were responsive to the request regarding the positioning of cameras and that Mr. Hicks's request for media forms was not sufficiently particularized to enable a response. (*Id.*) She later amended her response to indicate that the BTA did not have any records that were responsive to Mr. Hicks's request for media access forms. (*Id.*)

On December 2, 2021, Mr. Hicks returned to the BTA to observe adjudicatory hearings. (*Id.* ¶ 27.) He had told Ms. Crowley that he intended to attend and record the December 2 hearings. (*Id.*) Before driving to Columbus that day, Mr. Hicks

4

checked the BTA's online docket; the docket did not indicate that the hearings would not be in person and there was no information on how to call-in or access the hearings telephonically. (*Id*.) When he arrived at the BTA office building, Mr. Hicks was detained in the lobby by a BTA employee who had been informed to stop him and to contact security. (*Id*. ¶ 28.) Mr. Hicks was then escorted by two Ohio State Highway Patrol Troopers to the BTA offices, where he was informed that the hearings that day were not in person, but by telephone. (*Id*.) When he asked how he (or any citizen) would have known the hearings were telephonic and how to access the telephonic hearing, Ms. Crowley told him that he would have had to call the BTA. (*Id*. ¶ 29.) Mr. Hicks was then provided the call-in information for the hearings that day. (*Id*. ¶ 30.) Because the first hearing had already started, Mr. Hicks tried to use the BTA waiting area to call-in, but he was told he had to leave and was threatened with arrest if he did not. (*Id*. ¶¶ 30, 31.) By the time Mr. Hicks left the building and got to his car to call-in to the first hearing, it was over. (*Id*. ¶ 32.)

After confirming that the December 6 adjudicatory hearings were in-person, Mr. Hicks tried again to attend the proceedings. (*Id*. ¶ 33.) He also drafted and submitted requests to record the December 6 hearings using a form that he created, which requests he emailed to Ms. Crowley directly. (*Id*. ¶ 34.) The BTA emailed a response to his requests the morning of December 6, shortly before the first hearing was to start, stating that a decision would be made on his requests at each hearing. (*Id*. ¶ 35.) Mr. Hicks did not see that email before going to the BTA. (*Id*.)

When he arrived at the BTA on December 6, Mr. Hicks was "monitored by Ohio State Highway Patrol Troopers." (*Id.* ¶ 36.) Nevertheless, he quietly entered a hearing room and walked towards the seating area for observers. (*Id.* ¶ 37.) The presiding hearing officer then stopped the hearing and questioned Mr. Hicks, telling him that his request to record the hearing was denied. (*Id.*) In response, Mr. Hicks asked for the basis of the denial of his request. (*Id.*) Mr. Hicks was then "rushed by a uniformed officer" and escorted out of the hearing. (*Id.* ¶ 38.)

Once outside of the hearing room, Mr. Hicks questioned the basis for his treatment. (*Id.*) The uniformed officer directed Mr. Hicks to a sign in the lobby and to the BTA's website, but neither the sign nor the website explained why Mr. Hicks could not record the hearing. (*Id.*) Mr. Hicks was again threatened with arrest, and he was unable to observe all of the BTA hearings he desired to see that day. (*Id.* ¶¶ 38–39.)

Shortly after he was removed on December 6, the BTA permanently banned Mr. Hicks from attending any adjudicatory hearings other than those to which he is a party ("the December 9 Ban"). (*Id.* ¶ 40; Ex. 3 to Compl., ECF No. 5-3, PageID 59.) The stated reason for the December 9 Ban is that Mr. Hicks disrupted hearings on December 2 and December 6 causing the hearings not to go forward. (*Id.* ¶ 42; Ex. 3 to Compl.)  Mr. Hicks disputes both that he disrupted the hearings and that he caused them not to go forward. (*Id.*) The BTA subsequently banned Mr. Hick's wife from attending BTA meetings and hearings other than those to which she is a party. (*Id.* ¶ 43.) That ban alleges that Mrs. Hicks surreptitiously recorded small

claims hearings at the BTA in violation of the rules. (*Id*.) Both bans are indefinite—neither provide an expiration date or a procedure by which Mr. or Mrs. Hicks can appeal or seek review of the bases or terms of the bans. (*Id*. ¶ 44.) Mr. Hicks sought reconsideration of the December 9 Ban at a BTA nonadjudicatory meeting, but no one responded to him. (*Id*.)

After the issuance of the December 9 Ban, Defendant Crowley denied a public record request from Mr. Hicks asking for communications between her and board members relating to the December 9 Ban; the request was denied as too vague. (*Id*. ¶ 45.) Mr. Hicks then filed a complaint in the Ohio Court of Claims under Ohio's public records law to get her to respond to his request. (*Id*. ¶ 46.) After he filed suit, Ms. Crowley responded to his records request. (*Id*. ¶ 47.) The Court of Claims assessed court costs against the BTA in the amount of $43.73 in that case; the BTA appealed this assessment. (*Id*. ¶¶ 49–53.)

Mr. Hicks alleges that the December 9 Ban and the BTA's decision to appeal the assessment of court costs in the Court of Claims case are intended to chill his efforts to exercise his right to access the government. (*Id*. ¶ 53.) He brought this suit seeking to vindicate that right, and he seeks the following relief:

1. A declaration that the December 9, 2021 order banning him from attending BTA hearings other than those to which he is a party violates the First Amendment . . . ; a declaration that Hicks was improperly excluded from the December 2, 2021 and December 6, 2021 hearings; a declaration that Defendants retaliated against Hicks in violation of his First Amendment rights; and a declaration that the Ban violates Fourteenth Amendment procedural due process;

2. Preliminary and permanent injunctive relief barring the enforcement of the December 9, 2021 order, prohibiting Defendants

from retaliating against Hicks for exercising his constitutional rights . . . ;

3. Monetary damages against the individual Defendants for violations of Hicks' First and Fourteenth Amendment rights . . . ;

4. An award of attorney fees and costs pursuant to 42 U.S.C. § 1988 . . . ; and

5. Any other relief that is appropriate, just, and warranted in law or equity.

## II.    MOTION TO DISMISS

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal alteration and quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The Supreme Court has explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Directv, Inc. v. Treesh*, 487 F.3d, 471, 476 (6th Cir. 2007).

8

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

Defendants move to dismiss the Complaint on several grounds. First, they argue that they are entitled to Eleventh Amendment immunity. Second, they are entitled to absolute immunity because they were operating in a quasi-judicial capacity or as a judicial agency. Third, they argue that the individual Defendants are entitled to qualified immunity for certain of Mr. Hicks's claims. And finally, they argue that Mr. Hicks fails to state a claim upon which relief can be granted in Claims 2, 3, and 5. The Court will address each argument in the order in which Defendants raise it.

## A. Eleventh Amendment Immunity

Defendants seek dismissal of the claims against the BTA and the individual Defendants in their official capacities under the Eleventh Amendment, which states that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of a Foreign State." U.S. Const. amend. XI; (*see* Mot. to Dismiss, ECF No. 24, PageID 198–200). The amendment "'denies to the federal courts authority to entertain a suit brought by private parties against a state without its consent.'" *Maben v. Thelen*, 887 F.3d 252, 270 (6th Cir. 2018) (quoting *Ford Motor Co. v. Dep't of Treasury of Indiana*, 323 U.S. 459, 464 (1945)).

9

The Sixth Circuit directs that the scope of the Eleventh Amendment is "far reaching. It bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments, . . . by citizens of another state, foreigners or its own citizens. . . . The amendment also bars suits for monetary relief against state officials sued in their official capacity." *Thiokol Corp. v. Dep't of Treas.*, 987 F.2d 376, 381 (6th Cir. 1993) (internal citations omitted). And it "bars federal jurisdiction over suits against state officials when the relief sought is retrospective or compensatory in nature." *MacDonald v. Vill. of Northport*, 164 F.3d 964, 971 (6th Cir. 1999).

"There are three exceptions to sovereign immunity: (1) when the state has waived immunity by consenting to the suit, (2) when Congress has expressly abrogated the states' sovereign immunity, and (3) when the doctrine set forth in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) applies." *Boler v. Early*, 865 F.3d 391, 410 (6th Cir. 2017) (citation omitted). Mr. Hicks argues in response to the Motion to Dismiss that the *Ex Parte Young* exception applies here because he is seeking to enjoin the BTA and the individual Defendants in their official capacities from enforcing a ban against his presence at BTA hearings and from retaliating against him in the future.[3] (Mot. to Dismiss Memo Contra, ECF No. 28, PageID 220); *see also infra* Section II.C.

---

[3]To the extent he seeks monetary damages, he can seek that relief only against the individual Defendants in their individual capacities. The Eleventh Amendment does not bar suits against a government official in his or her individual capacity for monetary damages, but an award of damages can be executed only against the official's personal assets. *See Kentucky v. Graham*, 473 U.S. 159, 165–

The *Ex Parte Young* exception to sovereign immunity allows a plaintiff "to bring claims for prospective relief against state officials sued in their official capacity to prevent future federal constitutional or statutory violations, regardless of whether compliance might have an ancillary effect on the state treasury." *Boler*, 865 F.3d at 412 (internal quotation marks and citation omitted). The exception applies where the plaintiff alleges "an ongoing violation of federal law and seeks relief properly characterized as prospective." *Dubuc v. Mich. Bd. of Law Exam'rs*, 342 F.3d 610, 616 (6th Cir. 2003) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

*Ex Parte Young* saves Mr. Hicks's claims seeking preliminary and permanent injunctive relief. (See Compl., PageID 51.) He can obtain prospective injunctive relief against the BTA and the individual Defendants in their official capacities.

### B.   Absolute Immunity for Judicial or Quasi-Judicial Officers

Defendants next argue that they have absolute immunity because they were acting as quasi-judicial officers or as a judicial agency. (Mot. to Dismiss, PageID 200–02.) In response, Mr. Hicks does not dispute that that the BTA is a quasi-judicial body. Rather, he argues that absolute immunity is not applicable because the acts of which he complains are not tied to the individuals' adjudicatory functions but are non-adjudicatory acts. (Mot. to Dismiss Memo Contra, PageID 221–26.)

Judicial officers are immune from liability for damages for "acts committed within their judicial jurisdiction." *Pierson v. Ray*, 386 U.S. 547, 554 (1967). This

66 (1985).

immunity shields judges and other public officers "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). The doctrine of absolute judicial immunity does not apply to suits for prospective injunctive relief. *Pulliam v. Allen*, 466 U.S. 522, 536–43 (1983). "[T]he official seeking absolute immunity bears the burden of showing that immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 478 (1991). Courts have thus been "quite sparing" in extending absolute immunity to state actors in the § 1983 context. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). "The presumption is that qualified, rather than absolute, immunity is sufficient to protect government officials in the exercise of their duties." *Id*. at 486–87. This caution is reflected in the case law from the Sixth Circuit—that Court has observed that the application of quasi-judicial immunity to state governmental boards should be considered on a case-by-case basis. *See Flying Dog Brewery, LLP v. Mich. Liquor Control Comm'n*, 597 F. App'x 342, 349 (6th Cir. 2015).

Nevertheless, the doctrine of absolute judicial immunity has been extended to some non-judicial government officials who "perform functions closely associated with the judicial process." *See Flying Dog Brewery*, 597 F. App'x at 347 (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 200–01 (1985)). The level of immunity granted to various public officials is adjusted because it is "the nature of the function performed, not the identity of the actor who performed it, that inform[s the] immunity analysis." *Id*. Thus quasi-judicial immunity "attaches to public officials

whose roles are functionally comparable to that of a judge." *Id.* (quoting *Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011)).

To determine whether a public official is entitled to quasi-judicial immunity, the Court must examine "the nature of the functions with which a particular official or class of officials has been lawfully entrusted," and "evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Id.* at 347–48 (quoting *Forrester*, 484 U.S. at 224).

> The touchstone for the doctrine's applicability has been performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights. When judicial immunity is extended to officials other than judges, it is because their judgments are functionally comparable to those of judges—that is, because they, too, exercise discretionary judgment as a part of their function.

*Antoine v. Byers & Anderson*, 508 U.S. 429, 435–36 (1993) (citations and quotations omitted). Using this approach, the Court considers a non-exhaustive list of factors to determine whether a public official should be afforded quasi-judicial immunity:

1. the need to assure that the individual can perform his functions without harassment or intimidation;

2. the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct;

3. insulation from political influence;

4. the importance of precedent;

5. the adversary nature of the process; and

6. the correctability of error on appeal.

*Flying Dog Brewery*, 597 F. App'x at 348.

Here, the Defendants fail to establish that they are entitled to quasi-judicial immunity. Construing his allegations in the light most favorable to him, Mr. Hicks

has alleged that the individual Defendants were performing duties that were more ministerial or administrative in nature, not duties functionally comparable to those of a judicial officer. In the context of the allegations here, Defendants did not hear evidence, made no findings of fact, and drew no conclusions of law. (Compl. ¶¶ 22–39.) Mr. Hicks had no right to appeal the December 9 Ban. (*See id.* ¶ 44; Ex. 3 to Compl.) If the Defendants were not acting as hearing officers presiding over adjudicatory hearings when they issued the December 9 Ban, they were acting as administrators[4] and, as such, they are not entitled to judicial or quasi-judicial immunity.

### C. Individual Liability—Qualified Immunity

To state a § 1983 claim, Mr. Hicks must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the Defendants deprived him of this federal right under the color of law. *Jones v. Duncan*, 840 F.2d 359, 361–62 (6th Cir. 1988). In the case *sub judice*, Mr. Hicks asserts that the individual Defendants deprived him of his First Amendment right to access BTA hearings and right to freedom of expression (Compl. ¶¶ 55–64, 72–78), his right to procedural due process (*id.* ¶¶ 65–71), and his right to be free from retaliation for exercising his First Amendment rights (*id.* ¶¶ 79–83), all while acting under color of law.

To the extent that Mr. Hicks seeks damages against the individual

---

[4]In fact, in their Memorandum Contra to the Motion for Preliminary Injunction, Defendants acknowledge that Board members do not attend the adjudicatory hearings, which are conducted by attorney examiners. (ECF No. 8, PageID 104.)

Defendants in their official capacity (*id.* PageID 51), he is not permitted to do so. Section 1983 imposes liability only upon a "person" who, under color of law, subjects another person to a deprivation of federal rights, and state officials acting in their official capacity are not "persons" under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Gean v. Hattaway*, 330 F.3d 758, 766 (6th Cir. 2003) (explaining that § 1983 claims against agents of the state in their official capacity are not cognizable).

To the extent that Mr. Hicks seeks monetary damages against the individual Defendants in their individual capacities, Defendants argue that they are entitled to qualified immunity.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "[Q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

A district court may consider qualified immunity on a Rule 12(b)(6) motion, *see Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 677 (6th Cir. 2001), but it is "generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir.

15

2015). An officer's entitlement to qualified immunity is a "threshold question to be resolved at the earliest possible point" in litigation, but "that point is usually summary judgment and not dismissal under Rule 12." *Id.* at 433–34 (quoting in part *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003)); *see also Evans–Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 235 (6th Cir.2005) (Sutton, J., concurring) (observing that the fact-intensive nature of the applicable tests make it "difficult for a defendant to claim qualified immunity on the pleadings *before discovery*" (emphasis in original)). At the motion to dismiss stage, the relevant inquiry is whether the plaintiff has alleged "facts which, if true, describe a violation of a clearly established statutory or constitutional right of which a reasonable public official, under an objective standard, would have known." *Adams v. Ohio Univ.*, 300 F.Supp.3d 983, 1002 (S.D. Ohio 2018) (quoting *Doe v. Ohio State Univ.*, 219 F.Supp.3d 645, 664 (S.D. Ohio 2016)).

To determine whether a defendant is entitled to qualified immunity, the Court asks two questions: "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 231 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). It does not matter which query is addressed first; for immunity to attach, both must be satisfied. *Pearson*, 555 U.S. at 236–42; *see also Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018) (internal citations omitted). When a defendant raises qualified immunity as a defense, the

plaintiff bears the burden of demonstrating that the defendant is not entitled to the defense. *Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006).

### 1. Defendant Crowley

To succeed on his § 1983 claim against each individual defendant, Mr. Hicks must plead and prove personal involvement of each Defendant in causing his injury. *Hardin v. Straub*, 954 F.2d 1193, 1196–97 (6th Cir. 1992); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). A person cannot be held liable under § 1983 unless he or she personally participated in, or otherwise authorized, approved, or knowingly acquiesced in, the allegedly unconstitutional conduct. *Leach v. Shelby Co. Sheriff*, 891 F.2d 1241, 1241 (6th Cir. 1989); *Breen v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002) (stating that, "[a]t a minimum a 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct"). A plaintiff must demonstrate that a supervisory defendant "did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999).

Mr. Hicks does not allege that Ms. Crowley was personally involved in the issuance of the December 9 Ban. (*See generally* Compl. ¶¶ 40–44.) The documentation that he provides shows that the December 9 Ban was a decision by the three members of the BTA Board, not by Ms. Crowley. (*See* Ex. C to Compl.)

Accordingly, Defendant Crowley is hereby **DISMISSED**.

### 2. First Amendment Right of Access, Fourteenth Amendment Right to Procedural Due Process, and First Amendment Retaliation

In Claim 1, Mr. Hicks claims that Defendants violated his First Amendment right of access to the BTA's adjudicatory hearings. (Compl. ¶¶ 55–64.) In Claim 2, he claims that Defendants denied him of his First Amendment rights without due process—he alleges that they did not give him notice of the accusations against him, an opportunity to be heard by an unbiased decision-maker, or the right to appeal or seek review of the December 9 Ban. (*Id.* ¶¶ 65–71.) And in Claim 4, Mr. Hicks alleges that Defendants retaliated against him for his exercise of his First Amendment rights. (*Id.* ¶¶ 79–83.)

Defendants argue that they are entitled to qualified immunity on these claims because Mr. Hicks has no constitutional or statutory right to attend adjudicatory hearings to which he is not a party and that they banned him from the hearings because of his "repeated disruptive behavior." (Mot. to Dismiss, ECF No. 24, PageID 206.)

A "major purpose of [the First] Amendment was to protect the free discussion of government affairs." *Globe Newspaper v. Superior Ct.*, 457 U.S. 596, 604 (1982) (internal quotation marks omitted). Accordingly, "[i]t is now well established that the Constitution protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). The public and the press have the right to attend certain types of government proceedings (*Globe Newspaper*, 457 U.S. at 604 (criminal trials); *Publicker Indus. Inc. v. Cohen*, 733 F.2d 1059, 1067–1070 (civil trials)), and the Sixth Circuit has recognized that there is "a limited First

Amendment right of access to certain aspects of the executive and legislative branches." *See Detroit Free Press v. Ashcroft*, 303 F.3d 681, 695 (6th Cir. 2002).

The focus of Defendants' argument is that they can exclude Mr. Hicks from adjudicatory hearings because he was disruptive and interfered with multiple hearings. (Mot. to Dismiss, PageID 203–6.) And they are correct that a public body does not violate the First Amendment by the temporary removal of a disruptive participant from a limited public forum. *See Barna v. Bd. of School Directors*, 877 F.3d 136, 142–3 (3d Cir. 2017). However, Mr. Hicks specifically avers in his Complaint that he was not disruptive (Compl. ¶ 42) and on a 12(b)(6) motion, his factual allegations are taken as true. Moreover, Defendants' motion does not address the fact that the December 9 Ban is more than a "temporary" removal—it appears to be a permanent ban from BTA adjudicatory hearings.

Defendants are not entitled to dismissal of Claims 1, 2, or 4.

### 3.    First Amendment Right to Record

As to Mr. Hicks's asserted right to record the BTA adjudicatory hearings, the right of access does not necessarily create a federal constitutional right to record meetings, "particularly where the public is granted alternative means of compiling a comprehensive record." *See Whiteland Woods v. Twshp. of West Whiteland*, 193 F.3d 177, 183 (3d Cir. 1999); *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) (while the collection of information is an important aspect of the First Amendment, the ability to gather information is not an absolute right, and "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control.").

The Court has serious doubts about whether Mr. Hicks has a right to record meetings of the BTA, but this issue is best deferred. The Court and the parties will benefit from a more complete record so that the threshold access issues can be addressed and so that, if Mr. Hicks has a right of access to the BTA adjudicatory hearings, the parties can develop a factual record regarding whether there are alternative means by which Mr. Hicks can compile a record of the adjudicatory hearings. At that time, the parties can also brief whether this constitutional question is beyond debate for purposes of qualified immunity.

Defendants are not entitled to dismissal of Claim 3.

### D.     Failure to State a Claim

Finally, Defendants argue that Mr. Hicks has failed to state a claim under the First Amendment for violation of his freedom of expression and that he has not stated a justiciable claim for lack of procedural due process under the Fourteenth Amendment. (Mot. to Dismiss, PageID 208.) However, Mr. Hicks has sufficiently alleged constitutional claims for the same reasons that Defendants are not entitled to qualified immunity at this time.

### E.     Conclusion as to the Motion to Dismiss

Defendants' Motion to Dismiss is **GRANTED** as to Claim 5 brought under the Ohio Open Meetings Act, as to Defendant Crowley, and to the extent that Mr. Hicks seeks damages against the individual Defendants in their official capacities. The Motion **DENIED** in all other respects. (ECF No. 24.)

## III.   MOTION FOR A PRELIMINARY INJUNCTION

Mr. Hicks moves for a preliminary injunction prohibiting the enforcement of

the December 9 Ban. Specifically, Mr. Hicks "seeks only to remove the permanent, unchallengeable prohibition on his attendance at . . . open, public hearings." (P.I. Mot., ECF No. 6, PageID 77.) Thus, Mr. Hicks is not asking the Court to decide at this time whether or not he can record BTA adjudicatory hearings.

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of preliminary injunctions. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 573 (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (finding that issuance of a preliminary injunction "involve[es] the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it")).

To determine the appropriateness of a preliminary injunction, the Court must examine four factors: (1) whether the plaintiff has established a strong likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury if a preliminary injunction did not issue; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served if the court were to grant the requested injunction. *Leary*, 228 F.3d at 736. Each of these factors "are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Id*.

In the context of a First Amendment claim, the balancing of factors is skewed toward the first factor. As the Sixth Circuit has stated:

> [w]hen a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on

> the merits often will be the determinative factor. With regard to the
> factor of irreparable injury, for example, it is well-settled that "loss of
> First Amendment freedoms . . . unquestionably constitutes irreparable
> injury."

*Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting *Elrod v.*

*Burns*, 427 U.S. 347, 373 (1976) (plurality)). Accordingly, in cases like this one

implicating the First Amendment, the other three factors often hinge on this first

factor. "[T]he determination of where the public interest lies [ ] is dependent on a

determination of the likelihood of success on the merits of the First Amendment

challenge because it is always in the public interest to prevent the violation of a

party's constitutional rights." *Id.* (internal quotation marks omitted).

## A.  Likelihood of Success on the Merits

As discussed above, the First Amendment confers a limited public right of

access to certain government proceedings. *Detroit Free Press*, 303 F.3d at 695.

> A government operating in the shadow of secrecy stands in complete
> opposition to the society envisioned by the Framers of our Constitution.
> "[F]ully aware of both the need to defend a new nation and the abuses
> of the English and Colonial governments, [the Framers of the First
> Amendment] sought to give this new society strength and security by
> providing that freedom of speech, press, religion, and assembly should
> not be abridged."

*Id.* at 710 (citing *New York Times Co. v. United States*, 403 U.S. 713, 719 (1971)

(Black, J., concurring)). At its foundation, access to government proceedings is

"implicit in the guarantees of the First Amendment." *Richmond Newspapers*, 448

U.S. 555, 580 (1980). This right of access is grounded generally in a "purpose of

assuring freedom of communication on matters relating to the functioning of

government." *Id.* at 575.

22

To determine whether there is right of public access to BTA adjudicatory hearings, this Court applies *Richmond Newspapers*'s two-part "experience and logic" test.[5] *Id.* Part one of this test asks whether the proceeding at issue has "historically been open to the press and the general public" and part two asks whether "public access plays a significant positive role in the functioning of the particular process in question." *In re Search of Fair Fin.*, 692 F.3d at 429. If the answer to both of these questions is yes, then there is a presumptive right to access that cannot be overcome unless the government demonstrates a compelling interest in restricting access and any restriction is narrowly tailored. *Detroit Free Press*, 303 F.3d at 705.

### 1. Whether Tax Adjudicatory Hearings Have Traditionally Been Accessible to the Public

"[B]ecause a tradition of accessibility implies the favorable judgment of experience," the Court's analysis begins by considering "whether the place and process has historically been open to the press and the general public." *Press-Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 8 (1986).

Defendants do not dispute that the adjudicatory hearings regarding the valuation of real property for tax purposes have traditionally been accessible to the public—they concede that adjudicatory hearings are "public hearings." (P.I. Memo

---

[5]The "experience and logic" test was first used in the context of criminal proceedings but has since been applied to administrative proceedings as well. *See*, *Detroit Free Press*, 303 F.3d at 695–6 (applying the test to a "quasi-judicial government administrative proceeding"); *In re Search of Fair Fin.*, 692 F.3d 424, 429 (6th Cir. 2012) (test applies "in a wide variety of contexts . . . [outside the criminal context, including] administrative proceedings"); *U.S. v. Miami Univ.*, 294 F.3d 797, 820–24 (6th Cir. 2002) (applying test to university disciplinary records).

23

Contra, ECF No. 8, PageID 98 (citing Ohio Admin. Code § 5717-1-16(H))). Thus, the first element of *Richmond Newspapers* is met because the BTA itself recognizes that it has a tradition of at least some duration of allowing public access to its adjudicatory hearings.

<strong>2.      Whether Public Access to Tax Adjudicatory Hearings<br>Plays a Significant Positive Role in the Functioning of<br>Those Hearings</strong>

The Court next evaluates "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise Co.*, 478 U.S. at 8. And again, Defendants do not dispute that public access to adjudicatory hearings regarding the valuation of real property for tax purposes plays a positive role in the functioning of those administrative hearings. (*See generally* P.I. Memo Contra.) In fact, public access to BTA adjudicatory hearings assures that such hearings are conducted fairly and uniformly, discourages perjury and other misconduct on the part of participants, and protects against decisions based on secret bias or partiality. Public awareness of tax matters and the perception of fairness are fostered by the presence of members of the public, not just of those that are parties to a particular dispute, at BTA hearings. Participants in BTA adjudicatory hearings, whether the hearing examiner or the parties, are put on notice that their actions will be evaluated by the community. Accordingly, these are precisely the type of public proceedings to which the First Amendment guarantees a right of access.

24

### 3. There is a qualified right of access to BTA adjudicatory hearings, and a categorical ban on attendance at those hearings violates the First Amendment.

When a proceeding passes the "experience and logic" test, "a qualified right of access attaches to it" and it may be sealed only if it is "essential to preserve higher values" and is "narrowly tailored" to serve those ends. *In re Search of Fair Fin.*, 692 F.3d at 429. To be sure, the right of access is not absolute. Rather, the right may be curtailed when "denial [of access] is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Detroit Free Press*, 303 F.3d at 705 (citing *Globe Newspaper Co.*, 457 U.S. at 606–7). When curtailing access, the governmental entity must articulate what interest it is protecting and must make "findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press-Enter. II*, 478 U.S. at 9–10.

Here, Defendants argue that they have "a compelling interest in maintaining orderly and efficient hearings and that the Board's [December 9] Order is narrowly tailored to accomplish that interest." (P.I. Memo Contra, PageID 102.) The Court agrees that the Defendants have a compelling interest in orderly and efficient hearings and they have the right to exclude Mr. Hicks on the day or days that he is disruptive. *See Mezibov v. Allen*, 411 F.3d 712, 718 (6th Cir. 2005) (there is no right for spectators "to interrupt a judicial proceeding"). However, the December 9 Ban is not narrowly tailored to accomplish that interest.[6]

---

[6]While Mr. Hicks also argues that the December 9 Ban failed to state its basis with sufficient particularity to enable this Court's review (P.I. Reply, ECF No. 22, PageID 155), the Court need not address this argument now because the failure of the Defendants to narrowly tailor the December 9 Ban is dispositive of the instant

Factually, the parties dispute whether or not Mr. Hicks was disruptive during the December 2 and December 6 adjudicatory hearings. If he was disruptive, removing Mr. Hicks from a hearing to maintain order and decorum "constitute[s] an appropriate time, place, and manner regulation." *See Olasz v. Welsh*, 301 F. Appx. 142, 143 (3d Cir. 2008). However, Defendants' sweeping and never-ending banning of Mr. Hicks from all future adjudicatory hearings unless he is a party is not narrowly tailored.

When a governmental entity prohibits future access to its proceedings based on past conduct by a participant, that prohibition is not narrowly tailored. *See, e.g.*, *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 507 (6th Cir. 2001) ("where a law sets out primarily to arrest the future speech of a[n individual] as a result of his past conduct, it operates like a censor, and as such violates First Amendment protections against prior restraint of speech"). Courts that have considered this issue have consistently found that such a ban violates the Constitution. *See Ritchie v. Coldwater Cmty. Sch.*, 947 F. Supp. 2d 791, 820 (W.D. Mich. 2013), clarified on denial of reconsideration, No. 1:11-CV-530, 2013 WL 12421757 (W.D. Mich. July 29, 2013) (although defendant had the lawful authority to order plaintiff (who was creating a disturbance) to leave, he exceeded that authority by banning plaintiff for all purposes); *Seum v. Osborne*, No. 3:17-CV-00069-GFVT, 2018 WL 4685442, at *2–3, 5 (E.D. Ky. Sept. 28, 2018) (granting preliminary injunction to plaintiff who had been banned from the third floor of the

---

motion.

Capitol Annex even though plaintiff had made racist comments and the ban was intended to avoid future harassment of defendant's employees; the ban implicated plaintiff's liberty interest in access to his state legislators in their offices and he was entitled to due process before being deprived of that right).

In *Cyr v. Addison Rutland Supervisory Union*, defendant school district issued two notices of trespass prohibiting Mr. Cyr from entering its property after school staff were intimidated by Mr. Cyr when he personally delivered letters to the school on "nearly a daily basis" and he had engaged in other threatening conduct. 60 F. Supp. 3d 536, 539–40 (D. Vt. 2014). The notices of trespass barred Mr. Cyr from all school property for a period of two years from issuance. *Id.* at 540. The court concluded that the trespass notices violated Mr. Cyr's First Amendment rights because a "categorical ban" on his attendance at school board meetings was not "narrowly tailored":

> Protecting the safety of school staff is undoubtedly a significant government interest. *See Lovern v. Edwards*, 190 F.3d 648, 655–56 (4th Cir. 1999) (school officials have discretion to remove parents from school property in response to a threat of disruption). A categorical ban of a single individual from open school board meetings, however, is not narrowly tailored and does not leave open ample alternative channels of communication.

*Id.* at 547–8.

The *Cyr* court analyzed the legality of any restriction as to time, place, and manner of speech in a public or limited public forum: "a notice against trespass targeting an individual rather than the public generally is equivalent to an injunction against speech and the Supreme Court has explained, '[i]njunctions . . .

27

carry greater risks of censorship and discriminatory application than do general ordinances.'" *Id.* (quoting *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 764 (1994)). Likewise, "a categorical ban on expressive speech singling out an individual does not even satisfy the lower threshold of reasonableness review." *Id.* at 549.

Similarly, the Second Circuit found that a categorical ban on expressive activity in or around Vermont state court facilities or grounds was an unreasonable restriction—"[s]uch broad restrictions are generally frowned upon even in nonpublic forums." *Huminski v. Corones*, 396 F.3d 53, 92–93 (2d Cir. 2005). And the Middle District of Florida found that a future ban on attendance at public meetings is unlawful. *Brown v. Jacksonville*, No. 3:06-CV-122-J-20MMH, 2006 WL 385085, at *8 (M.D. Fla. Feb. 17, 2006). In *Brown*, the court issued a preliminary injunction prohibiting the City of Jacksonville from barring the plaintiff from attending City Council meetings and City Council Committee meetings for almost three months. *Id.* at *1–2. Jacksonville issued its ban after plaintiff had failed to comply with Council rules and was charged with resisting an officer and disturbing a lawful assembly. *Id.* The plaintiff's expulsion from a meeting due to her behavior was constitutional, but the *Brown* Court explained:

> [T]he City went beyond expelling her from the single meeting at which she was disruptive.
>
> . . . .
>
> Banning Plaintiff from future meetings is not a restriction that is "narrowly tailored" to achieve the significant governmental interest of running the meetings efficiently, while successfully preventing her disruptive behavior. Although the City does not have to use the "most appropriate method" of restricting the Plaintiff, it should nonetheless

> use a directive that is more "narrowly tailored" than a sweeping ban
> from future meetings for months.

*Id*. at *3–4.

The December 9 Ban is a categorical ban on all access to adjudicatory hearings unless Mr. Hicks is a party. It is not narrowly tailored; it entirely forecloses Mr. Hicks's access to almost all public BTA hearings. Mr. Hicks has shown a likelihood of success on the merits of his First Amendment Right of Access claim.

### B.     The Threat of Irreparable Injury to the Plaintiff

There is a real threat of irreparable injury to Mr. Hicks. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *See Elrod*, 427 U.S. at 373.

### C.     The Threat of Harm to Others

The BTA asserts that the issuance of a preliminary injunction would harm parties to BTA adjudicatory hearings because, if allowed to attend, Mr. Hicks could interfere with parties' ability to consult with legal counsel and present their evidence, and he could cause unnecessary expense and delay. (P.I. Memo Contra, PageID 107–08.) However, a presiding BTA hearing examiner will be able to address disruptive conduct by Mr. Hicks on a case-by-case basis. Nothing in the requested preliminary injunction prohibits the removal of Mr. Hicks (or anyone else) from a hearing if he is disruptive or otherwise interferes with the hearing process.

### D. The Public Interest

Based on the cited authority and discussion above, the public interest in government proceedings is well served by the issuance of the injunction. *See Reno*, 154 F.3d at 288.

### E. Conclusion as to the Motion for Preliminary Injunction

Mr. Hicks's Motion for Preliminary Injunction is **GRANTED**. (ECF No. 6.) The remaining Defendants are hereby **ENJOINED** from enforcing the December 9 Ban.

This Order does not allow Mr. Hicks to record adjudicatory hearings. Moreover, if Mr. Hicks is disruptive or interferes with an adjudicatory hearing, he may be removed from the proceedings that day.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED** on Claim 5 brought under the Ohio Open Meetings Act, as to Defendant Crowley, and to the extent that Mr. Hicks seeks damages against the individual Defendants in their official capacities. The Motion is **DENIED** in all other respects. (ECF No. 24.)

Mr. Hicks's Motion for Preliminary Injunction is **GRANTED,** and the remaining Defendants are hereby **ENJOINED** from enforcing the December 9 Ban. (ECF No. 6.)

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**

30